Let me call this case, which is Security and Exchange Commission versus John B. Froling. Thank you. Mr. Froling, you're appearing pro se. Yes, Your Honor. Good afternoon. Good afternoon. I want to thank the panel for excusing me when the last hearing was scheduled. I was sick, so I do want to extend my appreciation on that. I am appearing pro se. Okay. You may proceed. Your Honor, I want to just give a little bit of background about Greenstone. When this dispute arose in the summertime, the company, while it was small, was a thriving company in the sense that it had expended approximately a million dollars to develop a unique drying device chamber, like a kiln. It was different than a kiln in several respects, but it was a viable company with a viable product. It was a product that was very valuable to the environment. It reduced the time to dry wood, and it did it in a way that saved about 20 percent on energy costs. So it was a real company. Mr. Miwar, who was the president of the company, had put in over a million dollars, he and his family, to establish the company. There is some reference that the company was in need of money. That's not true. There's no evidence in the record that it was out of money. All companies, when they grow, they need working capital, so in the normal course of business that they would have to raise additional capital. But it was a viable company. Our law firm put in a substantial amount of time for which they were never paid. I was brought in by Mr. Miwar and some of the investors, and I had no experience in what they call a reverse merger, which is a type of transaction where a company merges with a public company. The operation was a private company. Your Honor, there's substantial authorities that were cited by the SEC. There's an enormous, over, I believe, 200,000 exhibits put in by the SEC in connection with this case, and I think it really gets down to a couple of principles. Number one, I truly believe that this case deserves a trial by jury. I believe that I'm entitled to that. I have made statements on the record. I have given certifications. I have offered and will reiterate my offer to take a lie detector test about what I knew and what I didn't know, and I think there's a substantial question of fact that are important to the resolution. There's one thing that is very obvious in this case, and that is Judge Cederbaum believed in her judgment that a lawyer had the obligation to determine the validity of all the facts. Obviously, nobody can disagree with trying to get the truth of everything, but the question is, is that the law? There are no cases cited with all the authorities put in by the government that show that a lawyer is a guarantor of the facts in an opinion. In the case of the work that I did, there were generally two types of transactions. One had to do with the typical 144K transaction, which are done by the billions of the record, if the SEC can tell you the number, but they're very substantial offerings, and that's a typical kind of a transaction. There were three lawyers that were involved in the company before I got there. I didn't have experience in the reverse merger. They did. Mr. Pearson had been involved in over 25. From what I understand, Ms. Sorles had been involved in many transactions, and Mr. Pritchard. That's the second type of transaction where I was given . . . You were familiar with 144K, though, right? I'm sorry? You were familiar with 144K?  Yes, Your Honor. But I was asked at the last minute by the transfer agent just to concur with the opinions submitted by these far more experienced lawyers. I was not asked to do a full opinion. It came in a very short period of time. There was no engagement to do that. I never got paid for doing those opinions. I looked at the opinions. I talked to both lawyers, actually three lawyers, about the transaction, and I was satisfied that from the experience and the contacts that I have with these people, that they could be relied upon. You know that these shares were not registered? They were issued pursuant to an exemption, Your Honor. That is correct. Your statement is correct. All right. Well, your time has expired. You have reserved two minutes for rebuttal. Thank you very much, by the way. Thank you. Thank you, counsel. May it please the Court, I'm Alan Caputi for the United States Securities and Exchange Commission. With me here today is Jack Kaufman and Alex Gengobani, who represented the SEC before the district court. Your Honor, the central issue in this case is whether or not Mr. Froehling acted with scienter when he wrote ten opinion letters saying that the 144K exemption applied to unregistered shares of Greenstone Securities. If we just focus on the first seven letters that Mr. Froehling wrote in 2007 and 2008, what's happening there is that Greenstone is raising cash by issuing shares to the Morelli Group, and the Morelli Group, acting as an intermediary for Greenstone, is turning around, selling the shares to the general public, and splitting the proceeds with Greenstone.  That is an offering by the issuer. 144K does not apply to offerings by the issuer. It applies to shareholders who, under the rule, are not, by the rule's terms, underwriters. Mr. Froehling knows that 144K does not apply to issuers. On pages 13 and 14 of our appendix, you'll see his testimony where he talks about how familiar he is, discussing his familiarity with rule 144K. On page 40 of our brief, he specifically says that he is aware that an offering by an issuer is not exempt under 144K. But that is exactly what is happening here. The issuer is raising money through an offering to the public using the Morelli Group as intermediaries. Could I ask you a question? Yes, sir. Is it your view that Mr. Froehling was acting, when he issued these letters, that misrepresented the situation? He was acting intentionally, that he knew that there was something wrong here, or recklessly? Your Honor, he was acting intentionally. That is my position. But at least if he did not know that rule 144K did not exempt issues by the offerings by the issuer, he was reckless. And I would also point out that 13A2 and 13A3 apply even if he acted negligently. But please keep in mind, you look at rule 144K by its terms. It says, in its terms, the rule 144K doesn't apply to affiliates of the issuer. Well, if it doesn't apply to affiliates of the issuer, it doesn't apply to the issuer. And so he knows that 144K doesn't apply, or he's reckless if he does not know. In addition, he has admitted in page 28 of our appendix, he admits in testimony that the holding period for 144K does not apply if the issuer is receiving new consideration at the time of the conversion. Here, we know that there is new consideration being provided to the issuer throughout this period of time. And so I'll just go a little bit more detail on this scheme here that was applicable to the shares that were issued during 2007-2008 when he wrote the first six opinion letters. In emails that Mr. Froehling received, I mean, they're in our appendix at pages 273 and 278. He admits receiving these emails, and these emails spell out what's happening here. They say that Greenstone is going to generate free trading shares of stock through using convertible notes. And how is that going to happen? Well, Mr. Froehling is going to write a 144K opinion letter directing the transfer agent to issue the unregistered shares without a restrictive legend. Then what's going to happen is Mr. Froehling is going to hold these shares and release them at intervals pursuant to a lockout agreement. Why do you use a lockout agreement? Because in one of these illegal offering schemes, you don't want to dump a lot of stock on the market at once and drive the price down. Then what happens is that Greenstone sells the shares, and you can see in these emails located at 273 and 278 of our appendix, you can see how the proceeds are going to be split up and that the issuer is getting half of the proceeds. The issuer at Greenstone is getting half of the proceeds. And so there is no genuine dispute. Mr. Froehling says there are factual disputes. There's no genuine dispute. There is no dispute that a reasonable juror would agree with. There's no dispute on these facts that a reasonable juror would agree with Mr. Froehling's position. As to the Martin and Pritchard letters, these are letters that Mr. Froehling has concurred with. Again, these letters state that 144K is applicable. Mr. Froehling knows that 144K is not applicable. Mr. Froehling even receives, what was going on at that time was that Greenstone was selling shares directly to the Morelli Group. And Mr. Froehling received $305,000 into his client trust account. He's receiving $305,000 into his client trust account from Starizewski, who is part of the Morelli Group. That account statement from his client trust account and that deposit can be seen on pages 224 of our supplemental appendix. As to Mr. Froehling's own opinion letters, he's admitted now that those opinion letters were wrong. He told the district court that he canceled the shares and didn't sell them. In fact, we see his brokerage accounts that he got $31,000 for the sale of Greenstone Securities. And those are the proceeds of Mr. Froehling's participation in the fraud. And so, Your Honor, the Securities and Exchange Commission respectfully requests for these reasons and for the reasons outlined in our brief that the judgment of the district court be affirmed. Are there any more questions? I have none. Thank you. Thank you. Mr. Froehling, you're reserved two minutes for rebuttal. Yes, Your Honor. The facts are not as stated by counsel, with all due respect to Mr. Caputo. First of all, the jurist on the telephone asked a question. Did Mr. Froehling do this intentionally or did he do it recklessly? That question was never answered. I have stated in a certification, I'll repeat it before, even though I'm no longer a lawyer, I take that oath of a lawyer seriously, always did. I did not know in any transaction in this case that there was any illegality at all. Any assertion- Did you know that $144K did not apply? Well, that's not what I said, Your Honor. What I said, whether it was applied or did not apply, in order for it to be illegal, there had to- Mr. Caputo said that there was a deal that their company was going to issue the shares. The shares were issued properly. There's nothing wrong with issuing those shares. They had a right to do that. Those shares were issued properly. And there was an agreement that the people that had the notes, that they were going to lend money to the company. There's nothing wrong with that. That's not illegal. There was no conspiracy that the company was going to sell the shares. He also said that through a roundabout procedure, it was Greenstone that was selling the shares. I did not say that, Your Honor. No, opposing counsel, Mr. Caputo said that. I disagree with that, absolutely. Well, that's the nature of our business. Well, but, Your Honor, that should be a matter of a trial. I mean, who knows what it was? We have to have testimony. There's no testimony in this case. There's been no hearing. There was a paper trail showing that the shares ultimately were sold by Greenstone through this method by which the money went back to Greenstone. Well, I'm sorry. Pardon me. I interrupted. I apologize. The money went back to Greenstone, even though there was an intermediary. There was not an intermediary. There were people that got the shares. They were not intermediaries. Those shares belonged to this group of people. They had notes that they had a right to convert. Oh, and they had a right to lend money to the company, which they agreed to do. There's nothing wrong with that. Certainly, I didn't know that there was any conspiracy that the company was going to sell the shares. Absolutely not. I would have never been part of it, and I disagree that the facts say that it was, Your Honor. Thank you very much. Thank you. Thank you both. Judge Stroni, we'll speak with you shortly. That takes care of our calendar. I'll ask the clerk to adjourn court. Court is adjourned.